## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**AIDA COLÓN-HERNÁNDEZ** *for Oscar Castrodad*,

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.

Civil No. 17-1456 (ADC)

## REPORT AND RECOMMENDATION

    Aida Colón-Hernández ("Colón") seeks review of the Commissioner's decision finding that her deceased husband, claimant Oscar Castrodad ("Castrodad"), was not entitled to disability benefits under the Social Security Act ("Act"), 42 U.S.C § 423, as amended. Docket No. 1, 18. Castrodad claimed disability in 2010 at age 52 due to various cerebral strokes he suffered, high blood pressure, gout in both his feet, and depression, and was awarded disability benefits in 2012. Transcript ("Tr.") 19, 40, 94, 731, 758. Subsequently, a non-attorney representative that submitted evidence relied on by an Administrative Law Judge ("ALJ") in finding that Castrodad was disabled was indicted by the U.S. Attorney after an investigation by the Office of the Inspector General ("OIG") revealed that he, and others, made false statements or other misrepresentations to the Social Security Administration ("SSA") in connection with claimants' applications for benefits. Tr. 19-20, 447, 815. Another hearing before an ALJ was held, excluding the discredited evidence. Castrodad was found not disabled, and the SSA ceased making disability benefit payments. Tr. 20, 32.

    Colón asks for judgment reversing the decision and reinstating benefits. Docket Nos. 1, 18. The Commissioner answered the complaint, requesting that the Commissioner's decision be affirmed. Docket Nos. 11, 23. This case is before me for a report and recommendation. Docket Nos. 13-14. After careful review of the administrative record and the briefs on file, I recommend that the court affirm the Commissioner's decision.

## STANDARD OF REVIEW

The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of

impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity ("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

In the event that the SSA believes that fraud or similar fault was involved in the adjudication of disability benefits, the SSA must redetermine its findings, as per sections 205(u) and 1631(e)(7) of the Act. 42 U.S.C. §§ 405(u) and 1383(e).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the administrative transcript.

Castrodad was born on January 24, 1958, had a Bachelor's degree, did not speak or understand English (preferred Spanish), and worked full-time as a claims supervisor (sedentary work) at an insurance company for around twenty-three years. Tr. 47, 129, 140, 731, 757, 759, 822. He would supervise eight persons; evaluate, hire, and fire personnel; assist clients; analyze

and manage claims, lawsuits, and transactions; process weekly reports; and perform data entry. His job required technical knowledge and skill, and use of machines, tools, or equipment. He would sit for six to seven hours; walk for fifteen minutes to half-an-hour; stand for approximately five minutes; climb two or three times a day; write, type, or handle small objects for four hours; and reach for four hours. He would frequently lift less than ten pounds (carry files from one place to another). He did not have to kneel, crouch, crawl, handle/grab/grasp big objects, or reach. Tr. 141, 759-760.

### Treating physicians

#### Dr. Roberto Martínez ("Dr. Martínez")

Dr. Martínez treated Castrodad infrequently for asthmatic bronchitis and acute pansinusitis, from 1998 to 2015. Tr. 24, 1172-1183. Castrodad first visited Dr. Martínez on January 12, 1998 for acute pansinusitis and acute bronchitis, and was prescribed allergy medication, antibiotics, and decongestants. Castrodad was not breathing rapidly (tachypneic), and appeared to be alert, oriented, speaking in complete sentences, and well-nourished. His nose's mucosa was moist and congested. Auscultation of the chest and lungs was clear, and lung volumes were normal. Spirometry tests were normal. There is no evidence that he returned in 10 days, as instructed. Tr. 1172, 1173.

Castrodad went to follow-up appointments on average twice a year from 1999 until 2009. Dr. Martínez noted in each follow-up visitation but for one[1] that "[w]ith regard to the original chief complaints, the patient has worsened." Spirometry tests were normal (except for on one occasion in December 2002 in which expiratory air flows were mildly obstructed). Some notes indicate that Castrodad responded to inhaled bronchodilators, and other notes indicate that he did not. There is no record of visits for 2001, 2006, and from 2010 to 2014. The last appointment on record is from August 14, 2015 for sleep disturbances, for which Dr. Martínez referred Castrodad to a sleep clinic. Tr. 1173-1183.

#### Hospital Metropolitano

On October 4, 2010, Castrodad suffered a stroke which required emergency hospitalization at Hospital Metropolitano. He was discharged on October 13. Discharge documents indicate that he had suffered an acute cerebrovascular accident, a hypertensive crisis, and high blood pressure.

---

[1] On October 21, 2005, Dr. Martínez noted that "the patient has neither improved nor worsened." Tr. 1178.

Tr. 148-149, 823-824. Progress notes are mostly illegible, but show that Castrodad was stabilized for uncontrolled hypertension in order to avoid other cerebrovascular accidents, and prescribed medications. Tr. 177-207, 852-873.

### Dr. José A. Padilla ("Dr. Padilla")

Dr. Padilla, cardiologist and internal medicine, treated Castrodad from 2003 to 2015 for high blood pressure and infarcts. Tr. 227-263, 922-986, 1009-1068, 1129-1143. Castrodad was also diagnosed with gout in 2010. Tr. 939. Most of the progress notes are illegible, but 2010 to 2015 progress notes show that Castrodad was alert and conscious, and had extremity edema. His lungs were clear, and he had no heart gallops. Tr. 926-939, 1131, 1139, 1141.

Dr. Padilla first assessed on October 18, 2010 that Castrodad would need short-term disability, but could return to work on December 31, 2010. Tr. 27, 1097. On October 24, 2010, Dr. Padilla then estimated a period of incapacity until May 2011, because he had residuals of his cerebrovascular accident that prevented him to work because of poor mental response and physical problems, and needed physical therapy. Tr. 1125-1128. On April 30, 2011 (Tr. 1101) and on June 4, 2011 (Tr. 1123), Dr. Padilla assessed that Castrodad's limitations would last throughout his lifetime, that his disability was total and permanent, and that he was unable to work.

### Dr. Teresa Castro Ponce ("Dr. Castro")

After his stroke, Castrodad also began treatment on October 20, 2010 with Dr. Castro, neurologist, until March 4, 2015. Tr. 761, 1215. Dr. Castro specified in a medical certificate from 2016 that Castrodad had been diagnosed with  multiple ischemic cerebral infarcts secondary to uncontrolled high blood pressure and expressive aphasia and right hemiparesis. She further stated that Dr. Padilla provided the main course of treatment to control the high blood pressure, which required multiple medications administered simultaneously, and that another course of treatment was physical and speech therapy provided by the Puerto Rico Health South Rehab Center. Tr. 1215.

 Dr. Castro prepared a neurological medical report form for the Social Security Disability Determination Program ("DDP") dated December 20, 2010, that Castrodad was diagnosed with multiple cortical and subcortical cerebral ischemic infarcts (as revealed by an MRI), uncontrolled high blood pressure, and hyperlipidemia, with a poor prognosis. He showed mild nasolabial flattening, expressive motor aphasia, decreased gag reflex for swallowing, speech impairment (had difficulty articulating words and non-fluent speech), mild ataxia, and reduced motor strength in

his extremities and hands but no muscle atrophy. The Babinski's test was positive at the right side. Dr. Castro further assessed that Castrodad's memory, judgment, and insight were adequate, but, as to his emotional ability, he had a sad mood. Tr. 874-876, 878-879.

When asked regarding Castrodad's ability to do work-related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling, Dr. Castro answered that Castrodad had problems with some of those activities due to hemiparesis and expressive aphasia. Tr. 876. Dr. Castro opined that Castrodad needed a cane because of gait instability (he dragged his right leg due to weakness). Tr. 878. He also presented limited right hand ability to grip, grasp, pinch, finger tap, oppose fingers, button his shirt, pick up a coin, and write. He was able to perform these tasks with his left hand. Tr. 879.

Treatment notes from Dr. Castro, dated February 14 and August 1, 2011 show that Castrodad received physical and speech therapy at the Puerto Rico Health South Rehab Center. In February, he had a gout attack with residual left ankle pain and showed expressive aphasia. In August, notes reflect that Castrodad felt better, and had mild expressive aphasia. Both months, he was alert and oriented, and had full motor strength. Tr. 918-919, 1215.

A brain MRI requested by Dr. Castro, dated May 5, 2011 showed no evidence of acute cortical infarct or intracranial hemorrhage. Tr. 920-921.

### Hospital HIMA San Pablo

Castrodad was admitted on January 5, 2016, and passed away of pneumonia on January 15, 2016. Tr. 1185, 1186, 1214. Dr. Castro's 2016 medical certificate clarifies that Castrodad passed away due to sepsis secondary to pneumonia, which turned out to be more devastating due to his state of health subsequent to ischemic cerebral infarcts and severe high blood pressure. Tr. 1215.

### Procedural History

Castrodad applied for disability insurance benefits on November 9, 2010, claiming to have been disabled since October 4, 2010 (alleged onset date) at age 52 due to three strokes he suffered, high blood pressure, stress, and gout in both his feet, and did not work since. Tr. 19, 40, 731, 758. He last met the insured status requirements of the Act on December 31, 2016.[2] Tr. 738.

---

[2] The ALJ cited Exhibit 2D in stating that the date last insured was in 2015, but that exhibit indicates the year 2016. Tr. 23, 738.

Colón submitted function and work reports (Tr. 132-139, 140-141, 147) on December 14, 2010 on behalf of her husband, claiming that she helped him prepare the report because he had trouble coordinating his thoughts and could not fill out the document alone. Colón further stated that Castrodad "[b]ecause of the three cerebral infarcts that have affected his ability to construct complete sentences, he forgets some words and cannot express everything he thinks. At the present time we are suffering under the concern that he might have another stroke. Furthermore, they have given him so many medications that we can't maintain the life that we did before, since they make him sedate and they take away his motivation completely and make him sleep and he doesn't have the strength to conduct a normal life." Tr. 139.

Colón further reported that Castrodad's conditions affected his ability to talk, hear, concentrate, comprehend, remember, follow instructions, finish assignments, use his hands, and climb stairs. Tr. 137. He could walk for ten to fifteen minutes before having to stop and rest, and rest for about fifteen minutes before continuing to walk. Tr. 137. He could not drive or go out alone as per his neurologist's instructions, and could not do house or garden work (the strokes affected him mentally and he lost strength in his legs). Tr. 135-136.

Colón would prepare Castrodad's food and take him walking to exercise because he lost strength in his legs. Colón would help him get dressed, supervise him while he bathed, and remind him of appointments and payments to be made. He could comb his own hair, but could not shave (he would go to a barber). He had problems urinating. Tr. 133, 136. Once in bed, he would get up several time to go to the bathroom. Tr. 133. Anxiety would also keep him up. Tr. 133. Castrodad could handle money (pay bills, count change, maintain a bank account) with Colón's help (she would help him prepare checks so that he could sign them). Tr. 135.

He enjoyed watching television, reading, listening to music, walking a bit, sitting out in the patio, going out (to church, sporting events, and out with the family), and traveling. Tr. 132, 136. He did not enjoy socializing because the stroke affected his speech and he felt uncomfortable and anxious communicating with others (he would forget words, could not concentrate, and get despondent). Tr. 137. His condition made him fear that he would suffer another more severe stroke or die. He was depressed at not being able to do the things he used to, and met stress with a lot of anxiety and inquietude. Tr. 138.

Colón-Hernández v. Commissioner of Social Security, Civil No. 17-1456 (ADC)          8

### Dr. Juan Batista ("Dr. Batista")

The DDP referred the case to Dr. Batista for a psychiatric evaluation, which he performed on February 22, 2011. Castrodad gave his own medical history and assumed a tense posture, but was cooperative and established visual contact with Dr. Batista. Castrodad expressed that since suffering his cerebral infarct, he had difficulty expressing himself, could not coordinate his thoughts, and was worried about his inability to express himself well. He felt depressed, anxious, and insomniac, but did not receive psychiatric treatment or take psychiatric medications. Tr. 884. When asked about his current level of functioning, Castrodad described his daily activities as not being restricted. He took care of his personal hygiene, fed himself, would go out alone, could drive a car, enjoyed having visitors, read, listened to the radio, and watched television. Tr. 885.

Dr. Batista observed that Castrodad had arrived alone, and walked at a normal rate without any motor deficit. He was alert and oriented in person, place, and time. His speech was audible, coherent, logical, and moderate in volume. He did not present psychomotor retardation. His intellectual capacity appeared to be average. His memory, attention, concentration, judgment, and introspection were adequate. He could manage money. Tr. 885, 886. Dr. Batista diagnosed a major depressive affective disorder, with health problems contributing to the disorder, and a GAF of 60%.[3] Tr. 887.

### Dr. Carlos Vázquez ("Dr. Vázquez")

On March 23, 2011, a state agency psychiatrist, Dr. Vázquez, prepared a psychiatric review technique form ("PRTF"), finding that Castrodad's affective disorders (slight depressive-anxious mood second to a recent physical medical condition) were not severe impairments. Tr. 891, 894. Dr. Vázquez assessed that Castrodad had mild functional limitations in activities of daily living,

---

[3] "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. A GAF score between 51 and 60 indicates 'moderate symptoms' or 'moderate difficulty in social occupational, or school functioning.'" *Hernandez v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 f.n. 1 (D.P.R. 2013)(*quoting* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR)). "The GAF score range between 41 and 50 is described as '[s]erious symptoms … OR any serious impairment in a social, occupational, or school functioning …'" *Id*. at f.n. 2.

"[T]he GAF rating system . . . is not raw medical data; rather, the system provides a way for a mental health professional to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *González-Rodríguez v. Barnhart*, 111 Fed. Appx. 23, 25 (1st Cir. 2004) (per curiam) (unpublished) (*citing Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

in maintaining social functioning, and in maintaining concentration, persistence, or pace. Castrodad had no episodes of decompensation. Tr. 901. Castrodad appeared to have good personal hygiene and appearance, came in alone to the appointment, gave his own personal information, was alert, oriented, and cooperative, kept good eye contact, and had no psychomotor alteration. His speech was intelligible, his intellect average, his thought process was maintained, and  he was logical, coherent, and relevant. His memory, attention, concentration, and judgment were adequate, and he appeared to be goal directed. Tr. 905.

On September 23, 2011, Dr. E. Charles affirmed Dr. Vazquez's psychiatric review. Tr. 806.

**Dr. Glenn Garayalde ("Dr. Garayalde")**

On April 14, 2011, Dr. Garayalde performed a consultative neurological examination. Castrodad arrived unassisted, appeared well-groomed and appropriately dressed, and was cooperative.

Castrodad told Dr. Garayalde that he mowed the lawn, took care of his personal hygiene, and drove short distances. The mental status examination results were normal, with suggested expressive aphasia and slow mentation. Tr. 906. His coordination (gait, tandem gait, finger-nose, heel-shin) were normal. His motor skills (tone, muscle bulk, muscle strength) were normal. As to functional capacity, Castrodad was able to sit, stand, tandem walk, walk on toes, walk on heels, climb on and off the examiners' table, dress and undress without any difficulty. Tr. 907. Castrodad could also ably grip, grasp, pinch, finger tap, oppose fingers, button his shirt, and pick up a coin with his right hand, but limitedly with his left hand. He was also limited in his ability to write (he was right-handed). Tr. 913.

Dr. Garayalde concluded that Castrodad suffered from hypertension, multi-infarct dementia, degenerative joint disease of the first metatarsal phalangeal joint, mild hallux valgus, and soft-tissue increase, with a poor prognosis from a labor point of view. Tr. 907.

**Dr. Florentino Figueroa ("Dr. Figueroa")**

On April 20, 2011, Dr. Figueroa, state agency internist, opined that Castrodad's conditions were non-severe because his motor functions improved from the hemiparesis, and the consultative expert's report revealed only some slow mentation and expressive aphasia. Tr. 917.

A hearing before an ALJ was held on July 18, 2012, in which Castrodad, a medical expert ("ME"), and a vocational expert ("VE") testified. The ALJ awarded disability insurance benefits on August 10, 2012. Tr. 94-118.

Colón-Hernández v. Commissioner of Social Security, Civil No. 17-1456 (ADC)                    10

Subsequently, on August 16, 2013, a non-attorney representative that assisted Castrodad in proceedings before the ALJ that found that Castrodad was disabled was indicted, along with others, for making false statements or other misrepresentations to the Social Security Administration ("SSA") in connection with claimants' applications for benefits.[4] Tr. 19-20, 447, 467-568, 467-568, 618-720, 815.

Castrodad passed away on January 15, 2016 (Tr. 20 fn. 2, 130, 818) before receiving a *Notice of Redetermination* from the SSA, dated February 5, 2016, notifying him that his former representative pled guilty to making false statements to the SSA and that the disability determination would be reconsidered as a fraud reconsideration case, excluding the discredited evidence (exhibits at Tr. 129, 208-226, 748, 798-803, 808-812, 990-1008) in order to determine if he was disabled and entitled to benefits by August 10, 2012, date when he was originally awarded benefits.[5] Tr. 20, 40, 447.

His widow, Colón, properly requested substitution of party. Tr. 20, 591. A hearing before another ALJ was held on July 8, 2016 to determine whether Castrodad was disabled from October 4, 2010 to August 10, 2012. Colón and a VE testified. Tr. 41-66.

Colón testified that Castrodad suffered from several seizures between 2010 and 2012, and had severe high blood pressure, blood clots in his brain, and gout, but no mental conditions. Tr. 50. He retired from work because, after leaving the hospital, a doctor told him that he could work no longer. Colón stopped working for four months as well in order to take care of him because he could not talk or walk well, had lost his strength in his hands and legs, would urinate himself, and needed therapy. To walk, he used a cane or would hold on to her. "He never recovered his speech." Tr. 55-56.

Colón further testified that Castrodad did not do house chores (such as cooking and laundry), and needed help taking care of his personal needs (showering and getting dressed). He would watch a lot of television, go on the computer, and sometimes go to church. He could drive,

---

[4] Samuel Torres-Crespo was charged in two indictments. He pled guilty, and was sentenced on January 8, 2016. *See United States v. Vargas et al.*, cr. 13-538 (FAB); *United States v. Vargas et al.*, cr. 13-539 (FAB).

[5] "Under sections 205(u) and 1631(e)(7) of the Act, the [SSA] must redetermine an individual's entitlement to disability insurance benefits and disregard evidence when there is reason to believe fraud or similar fault was involved in that individual's application for benefits." Tr. 19.

and they would go out to restaurants. They also went on a family trip to Disney World, and he used a motorized scooter to move around. He got along well with his family. Tr. 52-56.

The VE testified that Castrodad's past relevant work as a claims supervisor was skilled sedentary work. Tr. 59.

The first hypothetical question posed to the VE by the ALJ was if a person with the same age, education, and work experience as the claimant for the time period of October 2010 through August 2012 with the following limitations could perform past relevant work: able to lift, carry, push, or pull up to twenty pounds occasionally and ten pounds frequently; sit for up to six hours a day and/or walk for up to six hours a day; may occasionally climb ramps or stairs; may occasionally balance and stoop but never cross, kneel, or crawl; may not climb ladders, ropes, or scaffolds; may not do fast paced production work; need to avoid concentrated exposure to extreme heat, wetness, dangerous machinery, unprotected heights, and driving vehicular equipment. Tr. 60-61. The VE answered that such a person could work at the unskilled light level as information clerk, cashier, and order clerk. Tr. 61-62.

The second hypothetical posed was if the same person and restrictions contained in the first hypothetical, but with the following limitations, could work: lift, carry, push, or pull up to ten pounds occasionally and lesser weights frequently; sit for up to six hours a day and stand and/or walk for two hours a day. The VE answered that he could perform past relevant work (sedentary). Tr. 62. When asked if there were jobs using transferable skills that he could perform, the VE answered that there were, such as claims adjuster and insurance clerk. Tr. 63-64.

The third hypothetical question was if the person from the second hypothetical, with the following additional limitations, could work: could not maintain regular attendance or be punctual within customary tolerances. The VE answered that there would be no work that this hypothetical individual could perform. Tr. 64.

On September 13, 2016, the ALJ found that Castrodad was not disabled under sections 216(i) and 223(d) of the Act, terminated benefits, and advised that the SSA could treat all payments received as overpayments, which the beneficiary could request be waived. Tr. 19-33.

The ALJ sequentially found that Castrodad:

(1) had not engaged in substantial gainful activity between his alleged onset date of October 4, 2010, and the date he was originally awarded benefits on August 10, 2012 (Tr. 23);

(2) had a severe combination of impairments (multiple cortical and subcortical cerebral infarcts, mild expressive aphasia, hypertension, hyperlipidemia, left ventricular hypertrophy) that significantly limited his ability to carry out a full range of basic work activities (Tr. 23);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 25);

(4) had the RFC to perform light work[6] with no fast pace demand (lift, carry, push, or pull up to twenty pounds occasionally and ten pounds frequently; sit up to six hours out of an eight-hour day; stand and/or walk up to six hours a day; could not climb ladders, ropes, or scaffolds; could occasionally climb ramps and stair; occasionally balance and stoop; never crouch, kneel, or crawl). He needed to avoid all exposure to wetness (including wet, slippery, uneven surfaces) and hazards (such as dangerous machinery and unprotected heights), and avoid concentrated exposure to extreme heat. He could not drive vehicular equipment or do fast pace production work (Tr. 25-26)); and

 (5) as per his age, education, work experience, and RFC, Castrodad was capable of performing his past relevant work as a claims supervisor, which was a sedentary desk position which required very little climbing and no requirement of exposure to hazards, or other jobs in the national economy, and was therefore not disabled as defined in the Act at any time from the alleged onset date through the date he was originally awarded benefits. Tr. 30-32.

The ALJ considered the following evidence, and assigned weight. The ALJ gave no weight to Dr. Figueroa's case analysis that Castrodad's impairments would not cause significant limitations. Tr. 23. The ALJ did not give weight to Dr. Padilla's and Dr. Castro's opinions regarding impairment and inability to work, either. In his opinion, the treating physicians were not knowledgeable as to how Castrodad's conditions affected his daily living. Tr. 29-30. The ALJ did not adopt the VE's testimony, either. Tr. 30.

---

[6] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of up to ten pounds, walking or standing up to six hours of an eight-hour workday, and some pushing or pulling. Light work includes sedentary work, or work that requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour work day, occasional walking and standing for no more than about two hours a day, and good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a) & (b); SSR 83-10.

The ALJ also found that Castrodad's major depressive affective disorder, single episode, severe, was not persistently severe. The ALJ noted that Castrodad did not claim to be mentally limited, or seek mental health treatment. The ALJ agreed with Dr. Vázquez, Dr. Charles, and Dr. Garayalde's findings that Castrodad's mental status examination was normal (except for Dr. Garayalde's diagnosis of multi-infarct dementia, which the ALJ found was inconsistent with Dr. Garayalde's own findings). Colón did not testify as to depression or anxiety, either. At most, this disorder caused mild restrictions in daily activities, in maintaining social functioning, and in maintaining concentration, persistence, or pace. The ALJ gave no weight to Dr. Batista's GAF score because it is not an objective analytical tool, and reflected alleged symptoms and functional limitations at one particular moment in time. Tr. 23-24, 26.

As to Castrodad's asthma condition, the ALJ found that this condition was not severe, and that, although he died from complications of pneumonia, he left it untreated for years at a time, and his follow-up visits to Dr. Martínez were infrequent. Tr. 24. The ALJ also noted that Colón did not mention asthma as one of her husband's limiting conditions in her testimony. Tr. 26. The ALJ did not find Castrodad's gout to be severe, either, because uric acid levels and gait were normal (except for evidence of high uric acid in June 2012). Tr. 25.

The ALJ further found that, besides some expressive aphasia observed, the adverse neurological findings were essentially resolved within months of his October 2010 stroke. The ALJ also pointed out that the prior ALJ failed to acknowledge that Castrodad's motor strength was full in February and August 2011, with evidence of full strength in both arms and legs, normal muscle tone and bulk, and normal gait and coordination in April 2011. Tr. 25.

Colón requested review of the ALJ's decision (Tr. 9, 11), which the Appeals Council denied on February 16, 2017, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1. The present complaint followed. Docket No. 1.

## DISCUSSION

The court must determine whether there is substantial evidence to support the ALJ's determination at steps four and five in the sequential evaluation process that based on Castrodad's age, education, work experience, and RFC, Castrodad could perform past relevant work, and other work in the national economy, thus rendering him not disabled within the meaning of the Act. Colón argues that the ALJ failed to properly consider the medical evidence in the record. Docket No. 18.

Before entering into the substantial evidence analysis, I note that Colón, in her argument that the ALJ failed to properly apply the Medical-Vocational Guidelines, argues that the ALJ cited but ignored *Figueroa-Rodríguez v. Secretary of Health and Human Services*, 845 F.2d 370, 372 (1st Cir. 1998), which stated that an ALJ may not assume that because jobs exist in significant numbers in the national economy for English-speakers, that they also exist in Puerto Rico for those fluent in Spanish. Docket No. 18, p. 11-12. The ALJ included in his decision a footnote regarding English fluency for claimants residing in Puerto Rico, citing *Arce Crespo v. Sec'y of Health & Human Servs.*, 831 F.2 1, 6 (1st Cir. 1987), and *Figueroa-Rodríguez*. The ALJ concluded that the regulations and the First Circuit have not set forth a clear rule regarding grid requirements when a claimant lacks ability to read or write English but has twelve years or more of education outside the U.S. or a history of semiskilled/skilled work outside the U.S. As part of the step five determination that Castrodad was able to perform other jobs, the ALJ made an alternative finding that Castrodad, although unable to read or write English, could not be considered an illiterate individual because of his skilled past work experience, but that transferability of job skills was not material to the determination of disability because the use of the Medical-Vocational Rules as a framework supported a finding of "not disabled." Tr. 30-31.

It appears to me that Colón misread or purposely excluded from her arguments as to this matter a portion of the ALJ's explanation and findings. In summary, the ALJ considered that "[t]his agency recognizes that an individual unable to communicate in English may be limited, when performing work within the United States, in the same manner as an illiterate individual," but that the beneficiary in this case, who completed four years of college and whose past work was skilled, would not be considered the same as an illiterate individual. This analysis is only a portion of a wider analysis that led the ALJ to move from the Medical-Vocational Rule 202.14 analysis to acquiring a VE's opinion regarding jobs in the national economy that an individual with the beneficiary's age, education, work experience, and RFC could perform because of additional limitations to Colón's ability to perform a full range of light work. Tr. 30-32.

Moving on, the ALJ found that Castrodad had the RFC to perform light work with no fast pace demand. Colón claims that the ALJ's RFC finding was not supported by the evidence because the ALJ, as a lay person, lacks the expertise to translate raw medical evidence into functional terms and needed a medical source's RFC assessment. *Berríos v. Secretary*, 796 F.2d 574 (1st Cir. 1986). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner."

*Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). Ordinarily, an "ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso-Pizarro*, 76 F.3d at 17. So when "a claimant has sufficiently put [his] functional inability to perform [his] prior work in issue, the ALJ must measure the claimant's capabilities, and 'to make that measurement, an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person.'" *Id.* (*quoting Santiago*, 944 F.2d at 7). In other words, an ALJ needs a medical expert to translate medical evidence into functional terms. *Vega-Valentín v. Astrue*, 725 F. Supp. 264, 271 (D.P.R. 2010).

It is undisputed that Castrodad suffered a series of cerebral infarcts that limited his ability to carry out a full range of basic work activities. The record contains plenty of corroborative medical evidence of the strokes and of his high blood pressure condition. There is also ample evidence of medical exams as to physical functionality and observations by the treating and consultative physicians, which the ALJ made reference to throughout the written redetermination decision. The regulations require an ALJ to carefully consider a medical source's opinion about any issue "because a claimant's RFC is a medical question, [and] an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)(*citing Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); SSR 96-5p. 1996 SSR LEXIS 2. In reviewing the evidence, the ALJ should give "*more* weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician is presumed to carry controlling weight as long as it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Id.*; SSR 96-2p, 1996 SSR LEXIS 9. The ALJ may reject a treating physician's opinion when it is not supported by clinical evidence or is inconsistent with other evidence in the record, as discussed earlier. 20 C.F.R. § 404.1527(d)(2); *Arias v. Comm'r Soc. Sec'y*, 70 F. App'x 595, 598 (1st Cir. 2003). Valid reasons to discount a medical assessment, based on the factors set forth in 20 C.F.R. §§ 404.1527(c), include:

(1) the examining relationship (more weight is given to the medical source who has examined the claimant);

(2) the treatment relationship (more weight is given to a treating source's opinion because she/he can provide a detailed, longitudinal picture of a claimant's impairments, including the length of the treatment relationship and the frequency of treatment, and the nature and extent of the treatment relationship);

(3) the supportability of the treating source's opinion with relevant evidence such as medical signs and laboratory findings;

(4) the consistency of the treating source's opinion with the record as a whole; and

(5) the area of specialty of the medical source offering the opinion. 20 C.F.R. § 404.1527(c).

Furthermore, under the "good reasons" requirement, the ALJ is required to include in the notice of determination "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. The portions of an RFC assessment by a treating physician that meet the definition of medical opinion are subject to the "good reasons" requirement, whereas those parts that address capability to perform work are not entitled to significant weight because that issue is reserved to the Commissioner. *See Collins v. Astrue*, 324 Fed. Appx. 516, 520 (7th Cir. 2009). The ALJ afforded no weight to Dr. Padilla's and Dr. Castro's statements that Castrodad was unable to work, and some weight to Dr. Padilla's first assessment shortly after the 2010 stroke that Castrodad was disabled from any job function due to inability to communicate or think, finding it reasonable to assume that he would need time to recuperate from the stroke. Tr. 27. Therefore, the doctors' conclusions addressing capability to perform work were not entitled to significant weight because that issue is reserved to the Commissioner, and the ALJ properly gave those statements no weight.

What concerns me here is that, in the RFC analysis, the ALJ concluded on various occasions that a doctor's assessment or Colon's testimony at the hearing implied something else entirely, or that they implicitly admitted something else, or that certain events were unlikely to have happened. The ALJ's analysis of the medical record is plagued with assumptions of what happened during the time period, and the ALJ questions the knowledge each treating source had at the time regarding Castrodad's conditions, such as that Dr. Castro "arguably did not know anything about the beneficiary's 'state of health' before his death," or that "it is unlikely that the

beneficiary used a scooter during the later trip to Orlando," or that with regards to his medication regimen "it is more likely the beneficiary's compliance was spotty." Tr. 26-30. However, even excluding these assumptions integrated by the ALJ in his opinion, the thorough discussion of the evidence at Tr. 27-30 is sufficient to give the court notice of the evidence he considered and serves as "good reasons" for the weight the ALJ gave each treating source.

In reviewing the record to determine whether there is substantial evidence to support the RFC finding, there is longitudinal evidence of treatment (over a decade) for high blood pressure by Dr. Padilla. Dr. Castro's medical certificate confirms treatment by Dr. Padilla with multiple medications administered simultaneously, and of physical and speech therapy post-stroke. Dr. Castro further stated that the cerebral infarcts were secondary to uncontrolled high blood pressure, and I note that the ALJ assumed that Castrodad was inconsistent with regard to the use of his medications and follow-up medical appointments because Colón testified that the medications made Castrodad sleepy, but that he also had an active lifestyle (drove, went to church, watched television). ("At the hearing Ms. Colón admitted, implicitly, that the beneficiary was inconsistent with regard to the use of his prescribed medication." … "Perhaps because the beneficiary felt 'well,' there was presumably no return visits to Dr. Padilla until May 2010." Tr. 27.) Progress notes from Dr. Padilla and Dr. Castro also show that Castrodad suffered other symptoms during the relevant time period between 2010 and 2012, such as extremity edema, gout, and mild expressive aphasia.

To be sure, a medical report by Dr. Castro, dated December 2010, shortly after the last stroke, reveals that Castrodad had problems performing work-related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, and speaking, and limited ability to use his right (dominant) hand. As to his ability to speak, Colón reported in 2010 and testified in 2016 that the stroke affected Castrodad's speech and he felt uncomfortable and anxious communicating with others because he could not concentrate and would forget words, that he needed help with his personal needs, and that he could go out and drive.

Importantly, however, Dr. Castro's 2011 record then shows improvement after receiving physical and speech therapy. He still had mild expressive aphasia, but felt better, was alert and oriented, and had full motor strength. Dr. Batista, a consultative psychiatrist that examined Castrodad in February 2011, also observed him walking at a normal rate without any motor deficit. His speech was audible, coherent, and logical; he did not present psychomotor retardation; and his

memory, attention, concentration, judgment, and introspection were adequate. On April 2011, Dr. Garayalde, consultative neurologist, found that Castrodad's coordination, motor skills, ability to sit, walk, climb, and use his hands were normal, except for a limited ability to write. Castrodad also informed Dr. Garayalde in 2011 that he could drive and mow the lawn. He also showed some expressive aphasia and slow mentation. These findings strongly support the ALJ's determination.

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *See Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987). While an ALJ "is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). After thoroughly and carefully reviewing the record, I find that it contains substantial evidence to support the ALJ's RFC finding that Castrodad had the ability to perform light work as limited by the ALJ, and therefore recommend to the court that the Commissioner's decision be affirmed.

## CONCLUSION

For the foregoing reasons, the court should **AFFIRM** the Commissioner's decision.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 11th day of September, 2018.

*s/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge